

# HELEN F. DALTON & ASSOCIATES, P.C.
## ATTORNEYS AT LAW

80-02 Kew Gardens Road, Suite 601, Kew Gardens, NY 11415
Tel. (718) 263-9591 Fax. (718) 263-9598

July 12, 2021

**VIA ECF**
The Honorable Judge Stewart D. Aaron
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: **Ramirez, et al. v. 1494 First Ave Restaurant Corp., et al.**
    **20-CV-10949 (SDA)**

Dear Judge Aaron:

Our office represents Eusebio Ramirez, Ignacio Galeno, Jose Basurto-Vazquez, Jorge Luis Villa Medel, Jose Edwin Mendez, Bernardo Castillo Zamora, Jaime Agudo, Rene Rodriguez, and Francisco Merino (collectively, "the Plaintiffs") and we submit this motion jointly with 1494 First Ave Restaurant Corp., Famous Italian Village Inc., and Joseph Notaro (collectively, "the Defendants"), requesting the Court's approval of the parties' settlement agreement ("Settlement Agreement"). The Settlement Agreement, attached hereto as **Exhibit 1**, was achieved through the parties' Court-annexed mediation held on June 9, 2021 with the assistance of Court-appointed mediator Barry Gold, Esq.

The parties submit this motion in support of their position that the Settlement Agreement is fair and reasonable and does not raise any of the concerns cited in *Cheeks v. Freeport Pancake House, Inc*., 796 F.3d 199 (2d Cir. 2015). Furthermore, pursuant to the Court's June 15, 2021 Order, the parties also address: i) the settlement amount, ii) the parties' claims and defenses, iii) the parties' evaluations of the Defendants' potential monetary exposure and the bases for any such calculations, iv) factors the justify the discrepancy between the potential value of plaintiffs' claims and the settlement amount, v) the litigation and negotiation process, and vi) any other issues that might be pertinent to the question of whether the settlement is reasonable. Lastly, Plaintiffs address Plaintiffs' counsel's requested attorneys' fees and the attorney fee arrangement.

### I. The Settlement Amount

The parties agreed to resolve all claims asserted in this matter for $400,000.00, inclusive of attorneys' fees.

## II. The Parties' Claims and Defenses

### a. Plaintiffs' Claims

Plaintiffs are nine former employees of Defendants' restaurant, Italian Village Pizza, originally located at 1494 1st Avenue, New York, New York 10075 and later located at 1526 1st Avenue, New York, New York 10075.

Plaintiffs filed this lawsuit on December 28, 2020, alleging violations under the Fair Labor Standards Act ("FLSA") and New York Labor Laws ("NYLL"), specifically alleging that: i) they were not paid proper overtime compensation when they worked in excess of forty (40) hours per week, ii) they were paid rates that fell below the applicable state and federal minimum wage rates, and iii) they were not compensated for an additional hour of pay at the minimum wage for each shift worked in excess of ten (10) hours per day in violation of NYLL § 650.

Under the FLSA and NYLL, Plaintiffs' federal and state law claims are subject to statute of limitations periods of three and six years respectively. As the Complaint was filed on December 28, 2020, the relevant statutory period for Plaintiffs' wage-and-hour claims commenced on December 28, 2014 under the NYLL and on December 28, 2017 under the FLSA. As Plaintiffs alleged that Defendants were no longer owners and operators of Italian Village Pizza as of November 18, 2019, the relevant statutory period for Plaintiffs' claims in this matter was from December 28, 2014 until November 18, 2019.

Plaintiffs were employed at Italian Village Pizza as food deliverers, food preparers, cooks, cleaners, dishwashers, stockers, cashiers and in other non-overtime-exempt positions at the restaurant. Plaintiffs were employed for varying periods of time; six of the nine Plaintiffs began their employment prior to the relevant statutory period. However, within the relevant statutory period, Plaintiffs' length of employment ranged from ten months to five years and ten months.

In general, Plaintiffs alleged that they were required to work fifty-four (54) to sixty-six (66) hours per week. However, two of the Plaintiffs, Rodriguez and Merino, alleged that they regularly worked in excess of seventy (70) hours per week. Despite the fact that all Plaintiffs alleged that they were regularly required to work in excess of forty (40) hours per week, Plaintiffs alleged that they were paid flat weekly salaries that did not account or properly compensate them for their overtime hours. As such, Plaintiffs claimed that they were owed time-and-a-half their calculated hourly rate of pay – applying the New York State Hospitality Wage Order – for each hour of overtime worked.

Additionally, four of the nine Plaintiffs alleged that their calculated hourly rates based on their weekly salaries fell below the minimum wage for some portion of their employment within the relevant statutory period. As such, those Plaintiffs also allege that they owed the difference between the applicable minimum wage rate and their calculated hourly rate for each hour of their first forty hours of pay each week.

Lastly, seven of the nine Plaintiffs alleged that they were regularly required to work in excess of ten (10) hours per shift for each shift of their employment. As such, those Plaintiffs

claimed that they were entitled to an extra hour of pay at the applicable minimum wage rate for each shift in excess of ten (10) hours.

As a result, Plaintiffs claimed in excess of $1,000,000.00 in unpaid wages, with liquidated damages and statutory penalties. However, for reasons addressed below, Plaintiffs agreed to settle for a number below their best case scenario, accounting for risks of continued litigation and the possibility of recovering a lower amount at trial, the concerns about collectability of a judgment should they have prevailed at trial, and the length of time that would elapse between payment under the Settlement Agreement and a trial date.

### b. Defendants' Defenses

While Defendants have not disputed that the Plaintiffs were employees of the Corporate Defendants, Defendants have contended that the Plaintiffs' claimed hours and number of days worked each week were wildly exaggerated by the Plaintiffs and are not accurate. Defendants have asserted that the several of the Plaintiffs worked below forty hours a week and that the Plaintiffs that did work over forty hours in a week only worked only a few hours above forty hours in such week. Additionally Defendants have contended that all Plaintiffs were paid an hourly rate and not a salary and the Plaintiffs would only be entitled to half-time for all hours worked over forty in a week. In addition, Defendants have asserted that weeks when the store was closed due to the fire[1] as well as weeks where the Plaintiffs did not work due to extended vacations and/or visits out of the country should not be included in any calculations. Further, Defendants have asserted that several of the Plaintiffs did not work for the time period alleged and actually worked for shorter time periods then alleged in the Complaint.

### III. The Parties' Evaluations of the Defendants' potential monetary exposure and the bases for such calculations

### a. Plaintiffs' Position

As referenced above, Plaintiffs believed that – if they were 100% successful in establishing all of their claims as to the dates of their employment, their hours worked each and every week and their rates of pay – Defendants' exposure was in excess of $1,000,000.00 in unpaid wages, with liquidated damages and statutory penalties. Plaintiffs' counsel's estimate of Defendants' potential exposure was based on performing individualized calculations for each Plaintiff, using the alleged dates of employment, alleged hours worked per week, and alleged rates of pay received. However, Plaintiffs also recognized that it was unlikely that they would establish at a time of trial that they worked well in excess of 40 hours every single week within the statutory period and that they were never compensated at all for any of their overtime worked. As such, Plaintiffs believe that Defendants' *realistic* monetary exposure was below the aforementioned figure when attempting to quantify the potential risks of litigation and the likelihood of success on all claims asserted at the time of trial.

---

[1] During the relevant time period the pizzeria was closed for approximately two months due to a fire at which time the pizzeria changed physical locations and corporate names.

### b. Defendants' Position

If Defendants arguments were credited, Defendants' calculations indicate they would owe Plaintiffs less than the agreed settlement amount. However, factoring in the cost of litigating this manner and the possibility that a jury could conceivably find for Plaintiffs in an amount higher than the settlement amount, Defendants have agreed to the settlement herein.

## IV. **Factors that Justify the Discrepancy Between the Potential Value of Plaintiffs' Claims and the Settlement Amount**

### a. Plaintiffs' Position

The three most important factors that affected Plaintiffs' decision to accept a settlement amount below the potential value of their claims were: i) risks of continued litigation and the possibility of recovering a lower amount at trial, ii) the concerns of collectability even if they were to be awarded a judgment in a larger amount at the time of trial, and iii) the timing of such a trial.

Plaintiffs' rationale for accepting the settlement amount considered the continued risks of litigation. The parties were able to reach a settlement before engaging in intensive fact discovery. Plaintiffs risked that their claims could be undermined or reduced depending on the documentation produced by both parties during the exchange of paper discovery as well as their testimony provided at depositions. Moreover, the advance age of Defendant Notaro and the possibility of this litigation pushing Defendants to file bankruptcy were other factors that increased the risks of continued litigation. Lastly, given that the Plaintiffs agreed to a very substantial settlement amount, they understood the risk that a jury could have awarded them a lower amount at the time of trial. These risks favored early settlement rather than protracted litigation.

More importantly, although Plaintiffs were confident that they could succeed on all or most of their claims at the time of trial, their greatest concern was whether they would be able to collect on a larger judgment amount should they have prevailed at trial. Plaintiffs were aware that Defendant Notaro no longer owned the restaurant and was no longer the owner of any active business. That Defendant Notaro was no longer generating income from the business was of concern to the Plaintiffs. Further, Plaintiffs' counsel conducted a thorough investigation into the financial abilities and assets of Defendant Notaro and had the opportunity to question him regarding their findings through the Court-appointed mediator. Based on the above, Plaintiffs were concerned that even if they were to be awarded a substantially larger judgment at the time of trial, Plaintiffs may never recover the full amount of the judgment or that it could take many years to realize the full amount of the judgment through enforcement procedures.

Lastly, and tied in with the above concerns of enforcing a judgment, Plaintiffs considered the timing of payment in the immediate future (with a payment plan commencing on August 1, 2020, pending Court approval) as opposed to protracted litigation and judgment enforcement. Many judges in the Second Circuit have advised civil litigants that it is unlikely that they will proceed to a trial within the next year, particularly due to the backlog of cases caused by the Covid-19 pandemic. As this case was in the early stages of litigation, Plaintiffs reasonably expected that they would not have had a trial date in this matter for at least two years. Additionally, even if they were

to prevail at trial at some point in the distant future, Plaintiffs could not be certain that they would immediately collect on a judgment and understood that the enforcement procedures could take additional years before any recovery was actually realized by Plaintiffs.

That the settlement amount was both substantial and agreed upon in the early stages of litigation favored Plaintiffs' decision to resolve this matter for an amount below the estimated potential value of Plaintiffs' claims. Furthermore, the settlement allows Plaintiffs to avoid the risks of continued litigation, the possibility of not being able to collect on a judgment in the future, and avoids a lengthy waiting period and continued litigation before Plaintiffs could proceed to a trial. Plaintiffs preferred to receive a guaranteed settlement of $400,000.00 in the coming months rather than continue litigation for the mere possibility of being awarded a seven-figure judgment at a much later date in the future and having to engage in enforcement procedures to hopefully one day collect on that judgment.

### b. Defendants' Position

Defendants concur with Plaintiffs' analysis above and note that a significant portion of the mediation was devoted to discussions relating to Defendants' ability to pay in light of the Individual Defendant's advanced age and the reality that the Corporate Defendants have ceased operations. Defendants also considered the effect a protracted litigation would have on the Individual Defendant and considered the benefits to Defendants to resolving this matter prior to engaging in a protracted litigation.

### V.   The Litigation and Negotiation Process

Plaintiffs filed their Complaint on December 28, 2020 and an Amended Complaint on January 11, 2021. In February 2021, shortly after the Defendants retained counsel, the parties stipulated to extend Defendants' time to respond to the Complaint through March 29, 2021. On March 29, 2021, Defendants interposed their Answer and the matter was referred to the SDNY Mediation Program shortly thereafter. The parties held preliminary settlement discussions and exchanged their discovery responses pursuant to the Mediation Referral Order prior to scheduling the mediation.

The parties appeared for mediation on June 9, 2021. All named parties and counsel were present for the mediation before the Court-appointed mediator. The mediation lasted approximately seven hours culminating with an agreed-upon settlement based on the mediator's proposed settlement terms, which both parties accepted. The parties executed a term sheet following the mediation which was used to draft the Settlement Agreement submitted to the Court.

At all times, the parties maintained a professional relationship and negotiated in good faith in order to reach a settlement that is fair and reasonable to both sides. The settlement would not likely have been achieved without the assistance of the Court-appointed mediator and the parties' settlement efforts over the course of the full-day mediation on June 9, 2021.

## VI. Any Other Issues That Might Be Pertinent to Whether the Settlement is Reasonable

Based on the foregoing, the parties believe that the settlement is fair and reasonable. The settlement was achieved through the SDNY Mediation Program with the assistance of a qualified and experienced neutral and only after a full day of back-and-forth negotiations between the parties.

Moreover, the settlement amount falls within the reasonable range of recovery for the Plaintiffs when considering their estimate of monetary exposure, Defendants' defenses and potential witness testimony, and the risks of Plaintiffs not being 100% successful on all of their claims at a time of trial.

The settlement also allows both parties to avoid the risks of continued litigation. The settlement allows the Plaintiffs to avoid the risks of continued litigation undermining their claims and recovery a lesser amount at trial. The settlement also allows Plaintiffs to avoid the risks of not being able to collect on a judgment even if they were to prevail at trial. The settlement also gives Plaintiffs "peace of mind" that they are certain to receive substantial sums of money in the immediate future rather than the uncertainty of recovery much later in the future. The settlement also allows Defendants to have finality in this matter and not continue to incur litigation costs. Defendants also avoid the risk of Plaintiffs being awarded a judgment larger than the settlement amount at trial and also having to pay Plaintiffs' counsel's reasonable attorneys' fees in that event.

In sum, the parties submit that the settlement amount is reasonable. Moreover, the non-monetary terms are also fair and reasonable. The release in Paragraph 3 of the Settlement Agreement is carefully drafted to comply with Second Circuit case law in FLSA matters and there is no confidentiality clause contained in the agreement. Moreover, the non-disparagement clause in Paragraph 5 does not prohibit the parties from making any truthful statements regarding their experiences litigating this matter. As such, the parties' position is that the non-monetary terms of the Settlement Agreement are also fair and reasonable and comport with the standards articulated in *Cheeks*.

## VII. Distribution of Settlement Funds to the Plaintiffs and Plaintiffs' Counsel's Requested Attorneys' Fees and Expenses

### a. Distribution of Settlement Funds to the Plaintiffs

The parties agreed to a global settlement of $400,000.00 to resolve all claims asserted in this action. If the Settlement Agreement is approved by the Court, Plaintiffs will recover an aggregate amount of $266,012.00, after requested attorneys' fees. Each Plaintiff will receive an amount proportional to his calculation of damages, which accounts for the alleged dates of his employment within the relevant statutory period, the alleged hours that he worked each week, and the alleged rates of pay that he received. The individual amounts to be received by each Plaintiff are included in Paragraph 1(a)-(f) of the Settlement Agreement.

The proposed allocation of the settlement proceeds based on the above considerations is as follows:

| | |
|---|---|
| Eusebio Ramirez: | $36,000.00 |
| Ignacio Galeno: | $28,000.00 |
| Jose Basurto-Vasquez: | $31,000.00 |
| Jorge Luis Villa Medel: | $6,012.00 |
| Jose Edwin Mendez: | $13,000.00 |
| Bernardo Castillo Zamora: | $18,000.00 |
| Jaime Agudo: | $30,000.00 |
| Rene Rodriguez: | $56,000.00 |
| Francisco Merino: | $48,000.00 |
| **TOTAL** | **$266,012.00** |

### b. Plaintiffs' Counsel's Requested Attorneys' Fees and Expenses
### i. Plaintiffs' Counsel's Incurred Expenses

Plaintiffs' counsel respectfully requests $983.00 for identifiable expenses, which include:

- the Southern District of New York filing fee in this matter: $402.00
- the costs of service of the Complaint on Defendants in this matter: $442.00
- the costs of service of the Amended Complaint on Defendants in this matter: $139.00

### ii. Plaintiffs' Counsel's Requested Attorneys' Fees Based on Contingency Fee of 33% of the Net Settlement Amount

Plaintiffs' counsel respectfully requests one-third of the settlement less their identifiable expenses ($499,150.00), or $166,383.00 in attorneys' fees, as agreed upon in the Plaintiffs' retainer agreements with this firm. Therefore, if this request is approved, the total amount to be paid to the attorneys for their fees and expenses in this matter is $167,233.00.

**Settlement Amount:** $400,000.00
**Attorneys' Expenses:** $983.00
**Settlement less Expenses:** $399,017.00 ($400,000.00 - $983.00)
**Requested Attorneys' Fees:** $133,005.00 ($399,017.00 / 3)
**Total payable to Attorneys:** $133,988.00 ($133,005.00 + $983.00)
**Total payable to Plaintiffs:** $266,012.00 ($400,000.00 - $133,988.00)

7

Plaintiffs' attorneys and their clients have retainer agreements that are reduced to writing and are signed by the clients. The retainer agreements are attached hereto as **Exhibit 2**. Attorneys' fees of 33% on FLSA and NYLL claims are routinely approved by courts in the Second Circuit. *See, e.g., Calle v. Elite Specialty Coatings Plus, Inc.,* 2014 U.S. Dist. LEXIS 164069 (E.D.N.Y. Nov. 19, 2014) (approving settlement of FLSA and NYLL claims stating that a "one-third contingency fee is a commonly accepted fee in this Circuit"); *Rangel v. 639 Grand St. Meat & Produce Corp.,* 2013 U.S. Dist. LEXIS 134207 (E.D.N.Y. Sept. 19, 2013). Courts in this District typically approve a fee of one-third or less of the settlement amount. *See Santos v. Yellowstone Props, Inc.*, 2016 WL 2757427 at *4 (S.D.N.Y. May 10, 2016). "Fee awards representing one third of the total recovery are common in this District." *Gaspar v. Pers. Touch Moving, Inc.,* No. 13-CV-8187 (AJN), 2015 WL 7871036, at *2 (S.D.N.Y. Dec. 3, 2015). As a result, the Court finds that the requested attorneys' fees are "fair and reasonable." *Wolinsky,* 900 F. Supp. 2d at 335." *Hyun v Ippudo USA Holdings*, 14-CV-8706 (AJN), 2016 WL 1222347, at *3 (SDNY Mar. 24, 2016).

When FLSA actions settle early, the Court should use the percentage method as opposed to the lodestar method, due to the lodestar's potential to disincentivize settlement. *McDaniel v. Cty. of Schenectady,* 595 F.3d 411, 417 (2d Cir. 2010) (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 121 (2d Cir. 2005)).

The Honorable Judge Alison J. Nathan highlighted this issue in *Hyun v. Ippudo USA Holdings*:

> In this case, where the parties were able to settle relatively early and before any depositions occurred, *see* Dkt. No. 117 at 9, the Court finds that the percentage method, which avoids the lodestar method's potential to "create a disincentive to early settlement," *McDaniel,* 595 F.3d at 418, is appropriate. "Fee awards representing one third of the total recovery are common in this District." *Gaspar v. Pers. Touch Moving, Inc.,* No. 13-CV-8187 (AJN), 2015 WL 7871036, at *2 (S.D.N.Y. Dec. 3, 2015). As a result, the Court finds that the requested attorneys' fees are "fair and reasonable." *Wolinsky,* 900 F. Supp. 2d at 335.
>
> [*Hyun v. Ippudo USA Holdings*, 14-CV-8706 (AJN), 2016 WL 1222347, at *3 (SDNY Mar. 24, 2016).]

Here, Plaintiffs' counsel was able to procure a substantial settlement early in the litigation process, avoiding costly attorneys' fees. The parties had yet to engage in formal paper discovery, which would have required hours of preparing interrogatory and document demand responses as well as reviewing hundreds of pages of records produced in response to Defendants' anticipated discovery demands. The parties also would have had to conduct at least ten party depositions in addition to a number of potential non-party witnesses produced by both sides.

As such, this request for attorneys' fees is supported by the work performed by Plaintiffs' counsel throughout the litigation of this matter and the recovery secured through their efforts. Plaintiffs' counsel has zealously advocated for their clients throughout the litigation process and

Case 1:20-cv-10949-SDA    Document 22    Filed 07/12/21    Page 9 of 10

believe that the settlement amount secured is a product of their efforts. Furthermore, the fee requested is reasonable in relation to the recovery received by Plaintiffs.

### iii. Plaintiffs' Counsel's Lodestar Calculation as a Check on Plaintiffs' Counsel's Contingency Fee Request

Additionally, as a check on Plaintiffs' requested contingency fee, Plaintiffs' counsel's contemporaneous billing records, qualifications and lodestar calculation are attached hereto as **Exhibit 3**. As explained in greater detail in the attached billing records, Plaintiffs' attorneys' fees as calculated using the lodestar method are **$44,990.00.** Plaintiffs' counsel spent a combined **113.6** attorney hours and **67.2** paralegal hours working on this matter from intake of Plaintiff Santos through finalizing the Agreement for the Court's review and approval.

Although Plaintiffs' counsel's lodestar amount falls below their requested award of attorneys' fees based on the one-third contingency arrangement, this should not prevent the Court from awarding Plaintiffs' counsel's fee request pursuant to their retainer agreements with their clients.

Courts in this Circuit have approved a one-third contingency fee between two and six times the lodestar amount. See *Pinzon v. Jony Food Corp.*, No. 18-CV-105(RA), 2018 WL 2371737, at *3 (S.D.N.Y. May 24, 2018) (quoting *Johnson v. Brennan*, No. 10-CV-4712(CM), 2011 WL 4357376, at *20 (S.D.N.Y. Sept. 16, 2011)). In FLSA cases, when awarding fees based on hours worked, "courts in this district will often approve lodestar multipliers between two and four times." *Souffrant v. 14-15 Mertens Place Corp.*, 2020 WL 1166231, at *2 (S.D.N.Y. Mar. 11, 2020) (quoting *Montalvo v. Flywheel Sports, Inc.,* 2018 WL 7825362, at *6 (S.D.N.Y. July 27, 2018)); see also *Pinguil v. We are all Frank, Inc.,* 2018 WL 2538218, at *5 (S.D.N.Y. May 21, 2018) (collecting cases).

Here, Plaintiffs' counsel's one-third contingency fee request is approximately 2.9 times the lodestar amount, which falls squarely in between the "two to six times of the lodestar amount" regularly approved by Courts in this Circuit.

Moreover, Plaintiffs' counsel has routinely incurred higher fees using the lodestar method than their one-third contingency agreement and has never petitioned the Court to recover their lodestar calculation. *See Clarke v. Uptown Communications, Inc.,* Index No. 19-CV-6044 (E.D.N.Y. Oct. 29, 2018); *Flores v. 338 8th Avenue Corp.*, Index No. 18-CV-82 (S.D.N.Y. Jan. 5, 2018); *Cumbe v. SMC Stone International, Inc.,* Index No. 19-CV-1186 (E.D.N.Y. Feb. 28, 2019); *Taveras v. LTSD, LLC,* Index No. 18-CV-903, (S.D.N.Y. Feb. 1, 2018); *Paz v. World Class Garment Care Corp.,* Index No. 17-CV-4977 (E.D.N.Y. Aug. 23, 2017); *Palax v. Kum Gang, Inc.,* Index No. 18-CV-2095 (E.D.N.Y. Apr. 9, 2018); *Zavalla v. P & E Iron Work Corp.,* Index No. 18-CV-9777 (S.D.N.Y. Oct. 25, 2018).

As such, Plaintiffs respectfully request that the Court approve Plaintiffs' counsel's one-third contingency fee of $133,005.00 (representing one-third of the net settlement amount) before reimbursement of incurred expenses.

**VIII.   <u>Closing</u>**

In closing, the parties believe that the settlement amount and the terms of the Agreement are fair and reasonable. The settlement was the product of careful negotiation between experienced counsel with the assistance of an experienced and qualified neutral and the terms of the Settlement Agreement comport with Second Circuit case law. As such, we respectfully request that the Court approve or So Order the Settlement Agreement.

We thank the Court for its consideration and remain available to provide any additional information.

Respectfully submitted,

*James O'Donnell*
James O'Donnell, Esq.